[Civ. No. 3184.   Fourth Dist.   Feb. 20, 1946.]

JOHN CHERNABAEFF, Respondent, v. WILLIAM CHER-
NABAEFF et al., Defendants; JOSEPH BELSON,
Appellant.

West & Vizzard for Appellant.

Harvey, Johnston, Baker & Palmer for Respondent.

BARNARD, P. J.—This is an appeal from a judgment cov-
ering the balance of the purchase price for a crop of potatoes.
The plaintiff is a farmer and the defendant William Cherna-

baeff is his brother. The defendant Joseph Belson is a commission merchant in Chicago, operating under the name of United Produce Company. His brothers Robert Belson and Herman Belson were his agents and employees. William operated a packing shed, and had had previous deals with Joseph.

The plaintiff had 70 acres of growing potatoes. Sixty acres were on land he had rented from the Kern County Land Company, that company to receive as rental one-fifth of the proceeds of the crop raised thereon. On or about May 5, 1944, William telephoned to Joseph at Chicago informing him that he could purchase the plaintiff's 70-acre crop of potatoes for $300 an acre, a total of $21,000, payable $10,000 down and $11,000 when digging began. After an investigation by his brother Herman, Joseph entered into some sort of a deal to purchase the potatoes, it being agreed that he would advance the $21,000, that William would advance the cost of harvesting, that Joseph would have charge of selling and that they would split the profits. William was given a draft for $10,000 payable to himself which had appended to it "Advance on seventy acres of bulk potatoes as bought from John Chernabaeff to handle jointly by William Chernabaeff and United Produce." This draft was indorsed by William and given to John. When John received word that it had been paid and on May 11, 1944, he entered into a written contract with William providing for the sale of the potatoes for $21,000 but subject to and with the understanding that one-fifth of the crop on 60 acres belonged to the Kern County Land Company as rental.

Digging of the potatoes began on June 6, 1944. On that day William telephoned to Joseph at Chicago and during the conversation mentioned the crop rental feature. Joseph stated that he did not believe the existence of such a lien or claim and that he had not previously been told of it by anyone. Joseph immediately contacted his brother Herman in Idaho, who wired William demanding an explanation. On June 8, the plaintiff asked his brother William for the remaining $11,000, saying he would stop the digging if it was not paid. William sent him to Robert Belson, who was then Joseph's agent at Bakersfield, and who was then sick in bed at a hotel. Being told that the digging would be stopped if the $11,000 was not paid Robert, after being instructed to do so by William, gave the plaintiff a draft for $11,000 marked

"Balance of payment on seventy acres bought with Bill Chernabaeff." Joseph arrived in Bakersfield on the morning of June 9 and was told of the delivery of this draft. He remained around Bakersfield seeing to the shipping of the potatoes and, as he says, investigating the validity of the rental claim of the Kern County Land Company. On June 11, Robert found out that William was diverting some cars of potatoes to other parties and informed Joseph. On June 13, Joseph stopped payment on the $11,000 draft, but this fact was not discovered by the plaintiff until June 18. In the meantime, Joseph received and shipped some sixteen cars of potatoes. On June 19, William started an action against Joseph, in which a receiver was appointed, who finished the harvesting of the potatoes. On June 23, John brought this action to recover the balance due him on the sale of the potatoes.

The court found that Robert and Herman Belson were agents and employees of Joseph Belson in the operation of the United Produce Company; that on or about May 5, 1944, William Chernabaeff and Joseph Belson entered into an agreement whereby they would purchase certain potatoes from the plaintiff for their joint use and benefit; that Joseph would advance $21,000 for said potatoes to be purchased in the name of William; that in pursuance of this agreement, and on instruction of Joseph, Herman issued a draft for $10,000 to William for the purpose of making the down payment to the plaintiff; that this draft had attached to it the statement "Advance on seventy acres of bulk potatoes as bought from John Chernabaeff to handle jointly by William Chernabaeff and United Produce"; that this draft was indorsed by William and given to the plaintiff and was paid by Joseph; and that on May 11, after the plaintiff found that this draft had been paid, he and William executed a contract between himself as seller and William as buyer, providing for the sale of 70 acres of potatoes, 60 acres of which was subject to a rental due to the Kern County Land Company of one-fifth of the returns from the crop thereon, that this purchase was subject to that lease, that the buyer was to pay $21,000, $10,000 of which had been paid and the balance to be paid when digging commenced, and the buyer was to dig the potatoes at his own cost. It was then found that on June 6, 1944, William commenced to dig the potatoes so sold by the plaintiff; that on June 8, the plaintiff demanded from William and from Robert, as the agent of Joseph, that payment of the $11,000 be made or that the defendants cease digging the potatoes; that

on that day Joseph issued his draft for $11,000, payable to the plaintiff, to which was attached the words ''Balance of payment on seventy acres bought with Bill Chernabaeff''; that the plaintiff deposited this draft in his bank and on June 12 or 13, Joseph stopped payment thereon, which fact was ascertained by the plaintiff on June 16 or 18; that between June 8 and that time the plaintiff permitted the defendants to dig and remove the potatoes pursuant to the contract; and that prior to the time the $11,000 draft was issued and prior to the time any potatoes were dug from the 60 acres of rented land Joseph had been advised and knew that one-fifth of the crop on said 60 acres belonged to the Kern County Land Company. Judgment was entered against all defendants for $10,851.25, being the amount due on the contract less a small credit, about which there is no dispute. From this judgment Joseph Belson has appealed.

Briefly stated, appellant's position is that he had no dealings with the respondent; that the respondent sold this crop to his brother William; that the appellant merely financed William in this deal and entered into a joint adventure with William under which he was to handle the selling of the crop, William was to pay for the cost of harvesting and after the advances and costs were paid they were to divide the profits. In accordance with this theory the appellant contends that the respondent is not entitled to recover from him for three reasons: 1. That the respondent having contracted with one member of a joint adventure cannot hold the other undisclosed member since the contracting member exceeded his authority. 2. That since the respondent knew there were two members of the joint adventure and yet chose to enter into a contract with one of them individually he thereby elected to hold only the one he contracted with and not to obligate the other. 3. That the respondent, in selling the potatoes to his brother William, knew or suspected that William was intending thereby to work a fraud upon the appellant. This last contention is based on the assertion that William intended, by taking the contract in his own name, to be in a position to claim the potatoes for himself if the market went up or to claim that he and Joseph were buying the potatoes if the market went down, as it did in this case. The difficulty with this contention is that there is no evidence in the record of such an intention on the part of William nor any knowledge of any such thing on the part of the respondent.

It is unnecessary to consider the cases cited in connection with the first two grounds of appeal relating to transactions by a third party with an individual member of a joint adventure. The distinction is pointed out in one of the cases relied on by appellants, *Hansen* v. *Burford*, 212 Cal. 100 [297 P. 908], where the court said: "When, however, the rights of third parties are involved, the basis of the inquiry shifts materially, and the fundamental questions are, what had those third parties the right to believe from the language of the contract and from the conduct of the parties to it as affecting them, and not as affecting each other." The essential and controlling question here is as to whether there is sufficient evidence to support the court's findings to the effect that the respondent agreed to sell this crop to his brother William and Joseph Belson jointly, and that before the $11,-000 draft was issued Joseph Belson knew that one-fifth of the crop on 60 acres of this land belonged to the Kern County Land Company, and was not included in the purchase price of $21,000.

There is evidence which indicates that the appellant and William were buying this crop together and that the former was not merely advancing money in order to handle potatoes which William had purchased. William testified that he talked to John early in May; that "I told him if he would give me a chance I would buy them for Joe Belson in Chicago"; that John said he would give him to about May 5, in order to raise $10,000; that he talked to Joseph on long distance and told him he had a chance to buy these potatoes for $21,000, $10,000 down and $11,000 when digging commenced; that he told Belson that on 60 acres they were to get only four-fifths of the potatoes; that Joseph told him to see Herman, who was in Bakersfield; that a few minutes later Herman called him on the telephone and he took him out and showed him the potatoes and told him what Joseph had said; that Herman called Joseph in Chicago and after talking with him gave William a draft for $10,000; and that in his conversation with Joseph they agreed to divide the profit or losses fifty-fifty. Herman Belson testified that William told him that he had talked to Joseph in Chicago; that he was buying 70 acres of potatoes to run through his shed that "Joe Belson and he was to handle in a joint venture"; and that Joseph wanted him to go and look at the potatoes. He then testified that he looked at the field; that "it looked to

me like it might be a money-making deal''; that he asked William what he was paying for the potatoes and whether or not it would be a joint venture; that he heard William tell Joseph over the telephone that ''I was to take the field of potatoes with him and he would like to handle these potatoes through his shed''; that nothing was said about a crop rental; that Joseph gave him some figures and ''I tried to estimate what the potatoes were going to cost us''; and that after again talking with Joseph and telling him that he thought it would be all right he gave William a draft for $10,000.

Robert Belson testified that he took over Herman's duties in Bakersfield in May; that he first saw the respondent on June 8; that he was in bed at the time; that John told him he wanted the $11,000 that Bill owed him on the additional finance of the crop for $21,000; that William got hold of him and told him to pay John the $11,000 or John would ''stop us from getting the crop''; that he gave John a draft for $11,000; and that on June 11, he discovered that some of the potatoes were being sold to somebody else and told Joseph the same day.

The appellant himself testified that William called him up about May 5 and told him he had tied up or had an option with his brother for 70 acres of potatoes and that he could not go through with the deal unless he could get outside finance; that the deal required $10,000 down and $11,000 when harvesting started; that he replied ''It sounds all right'' and that he would have Herman look over the deal and if it looked all right ''We would go through with it, we would advance him $10,000 on potatoes he had contracted with his brother''; that it was agreed he was to advance $21,000; that William would pay for the harvesting and packing, and ''all sales were to be handled by me''; that he called Herman and told him to look into the matter; that Herman did so and called him back and he again also talked to William; that he told Herman to give the check for $10,000 to William, which was done; that he knew nothing about the claim of the Kern County Land Company for rent until June 6; and that he then called Herman who was in Idaho. It appears that Herman sent William a telegram dated June 6, reading: ''Seems you have difficulty getting full delivery on joint acreage we bought from your brother John. We were given to understand he owned crop no landlord mentioned. Wire me your side story before any drastic action is taken.''

Joseph also talked with Robert on the 6th about someone claiming rent but said, as Robert was sick, "I couldn't get much out of him." Joseph further testified that he got to Bakersfield on Friday morning and Robert told him the $11,000 draft had been issued the previous day; that on Saturday he advanced to William's son $1,000 for harvesting in order to keep the picking crew working; that on Saturday "Everything was going along, I still refused to believe anyone owned a fifth of these potatoes and Tuesday was going along, Monday was going along, they still gave me cars"; that on Tuesday he discovered that some potatoes had been sold to two other firms; that he asked these firms not to pay the money to William; and that he stopped payment on the $11,000 draft on Wednesday "when I found they were taking the potatoes and this crop rental."

Not only does some of this testimony, with the reasonable inferences therefrom, justify the conclusion that these potatoes were sold to the appellant and William jointly, but the conduct of the parties strongly supports this conclusion. The respondent first gave his brother time in which to buy them for Belson. The fact that the written contract named only William as the purchaser is not inconsistent with that purpose. The respondent knew when he received the first payment that the money came from the appellant and the notation attached to the draft stated that it was an advance on potatoes bought and to be handled by them jointly. He refused to allow the digging to continue until the second payment was paid and then he permitted them to proceed. The draft he received stated that it was the balance due on 70 acres bought with William.

The conduct of the appellant is even more significant. He admitted that he was told of the rent matter on June 6, and having come to Bakersfield was told on the morning of June 9 that the final payment had been made to the respondent. He not only went on receiving the potatoes but advanced more money for harvesting them and he did not stop payment on the draft until the 13th, two days after he had learned that some of the potatoes had been diverted by William, and after the market had gone down. With full knowledge of the situation he continued to take the potatoes as fast as they were harvested until the respondent finally discovered that payment had been stopped on the draft. If there be any doubt as to his original intention and understanding, a complete

case of affirmance and ratification appears on the part of the appellant after he had been informed of the rental matter, and when he knew that the respondent had accepted him as one of the buyers. The essential findings which are controlling are sufficiently sustained by the evidence.

The judgment is affirmed.

Marks, J., and Griffin, J., concurred.